IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 22-121-BLG-SPW |
| Plaintiff, | |
| vs. | ORDER |
| BRIAN GEORGE FUNK, | |
| Defendant. | |

Before the Court is Defendant Brian George Funk's Motion to Suppress. (Doc. 19). Funk seeks to suppress all evidence seized from his truck during the traffic stop on the grounds that law enforcement lacked reasonable suspicion to expand the scope and duration of the traffic stop and lacked probable cause to seize and subsequently search the truck. (Doc. 20). The United States opposes the motion. (Doc. 24). On June 2, 2023, the Court held a hearing on the matter, during which Montana Highway Patrol Trooper Toni Snelling and Billings Police Department Officer Brandon Ihde testified. (Doc. 30). Considering the parties' briefing and the testimony and evidence presented at the hearing, the Court grants Funk's motion.

//

//

//

1

## I.    **Factual Background**[1]

On August 24, 2021, at about 7:30 a.m., Funk was driving a 1998 black

Dodge Ram truck with Washington state license plates eastbound on Interstate 90

southwest of Billings. (Doc. 21 at 10). At about milemarker 437, Trooper

Snelling, who was parked in the median, clocked the truck traveling at 83 mph.

(*Id.*). The speed limit was 65 mph. (*Id.*).

Trooper Snelling pulled out behind Funk. (*Id.*). Funk then exited the

interstate and pulled onto the shoulder of the off-ramp, reportedly before Trooper

Snelling activated her emergency lights, though the timing is not entirely clear

from Trooper Snelling's in-car video. (*Id.*). Trooper Snelling activated her lights

and stopped behind Funk. (*Id.*). She approached the driver's window, explained

the reason for the stop, and asked for Funk's license, registration, and proof of

insurance. (*Id.*). Funk provided his license and registration and stated he did not

have insurance. (*Id.*). Trooper Snelling asked where they were headed. (*Id.*).

Funk stated he and his passenger were going to Sheridan to help a friend make

repairs to her mobile home so she could sell it and move to Washington. (*Id.*).

---

[1] The facts are based on the Arbitrator dash camera video recording from Trooper Snelling's patrol car (Doc. 23); the reports of Trooper Snelling, Officer Ihde, and DEA agent Jeremy Crowther (Doc. 21); testimony of Trooper Snelling and Officer Idhe; and the parties' briefing. Much of the audio from the Arbitrator video is inaudible, since Trooper Snelling's personal microphone was not on.

Trooper Snelling noticed that Funk was extremely nervous, fidgeting in his seat, looking out ahead of the vehicle, and stammering as he spoke. (*Id.*).

At 7:33 a.m., Trooper Snelling returned to her car to verify Funk's information and order a criminal history check. (Doc. 23 at 7:33:12). Dispatch reported Funk's information as valid, and that he had restrictions of financial responsibility, a pretrial ignition interlock device, no warrants, and no priors. (*Id.* at 7:34:57-7:35:13).

While Trooper Snelling was waiting for dispatch to check Funk's information, Officer Idhe pulled up to check on her. Trooper Snelling described Funk's story to Officer Idhe, noting that it was "very weird" and that he was "very nervous." (*Id.* at 7:36:10). A couple minutes later, Trooper Snelling asked Officer Idhe if she "needs a reason to run an EPIC check."[2] (*Id.* at 7:38:11-30). Trooper Snelling and Officer Idhe then discussed what facts existed that established reasonable suspicion to justify the EPIC check. Officer Idhe noted Funk's "inconsistent story" and that they were traveling from a source state to a destination state.[3] Trooper Snelling interrupted Officer Idhe to say the story is

---

[2] An EPIC check refers to the El Paso Intelligence Center, which is a database of information from different law enforcement agencies. *United States v. Gorman*, 859 F.3d 706, 711 (9th Cir. 2017).

[3] Officer Idhe testified that a source state is where contraband, here illicit drugs, originates (i.e. is produced in or transported from and redistributed). A destination state is where illicit drugs are brought for sale to users. Washington is considered a source state, and Wyoming is considered a destination state.

"odd." Trooper Snelling then ordered the EPIC check on Funk, though dispatch did not receive it for another two minutes. (*Id.* at 7:38:33-7:40:38).

While they were waiting for the results of the EPIC check, Officer Idhe asked Funk to talk with him outside his truck. There is no audio of this conversation, but Officer Idhe reported that Funk was nervous, shaky, and inquisitive about why Officer Idhe wanted to speak with him. (Doc. 21 at 5). Funk told Officer Idhe that he was traveling from Spokane to Sheridan to repair a friend's house for sale, and that he was staying for one to two days. (*Id.*). He said he met the passenger through their girlfriends, had known him for about three years, but did not know his last name. (*Id.*). Funk also stated that he and the passenger each had bags in the truck, though Officer Idhe reported only observing a backpack on the driver's rear seat and a cooler on the passenger rear seat. (*Id.*).

Officer Idhe then spoke with the passenger, later identified as Mark Gregory, who was still in the truck. (*Id.*). Funk waited at the back of the truck. (*Id.*). Officer Idhe asked for identification, which Gregory declined to give, though he had it. (*Id.*). Gregory stated he had known Funk for two to three years,[4] that they met through their girlfriends, but that he did not know Funk's last name. (*Id.*). Gregory explained that he did not know who they were going to meet in Sheridan

---

[4] Officer Idhe's report explains that Gregory said he had known Funk for two years (*id.*), but, during the hearing, Officer Idhe testified that Gregroy said he had known Funk for three years.

but that it was possibly a female friend of Funk's who they were going to help move to Spokane. (*Id.*). Gregory also stated he had no luggage, only the clothes on his back. (*Id.*).

During the hearing, Officer Idhe described this conversation as raising a lot of red flags, namely that the trip was from a source to a destination state, they drove through the night, they were only staying for a day or two, they had no observable tools or luggage consistent with the purpose of the trip, their accountings of their luggage was inconsistent, and they did not know each other's last names. Officer Idhe testified that after he spoke with Gregory, he suspected there was possibly some contraband in the vehicle being transported to Wyoming.

Fifteen minutes into the stop, Officer Idhe walked back to Trooper Snelling's car and told her, "Yeah, this story is really inconsistent." (Doc. 23 at 7:45:40). Officer Idhe explained that Gregory would not give him his identification, despite having it, but that he thinks Trooper Snelling has enough suspicion to demand it. (*Id.* at 7:47:05). Officer Idhe stated he thought that the stop was developing into a drug investigation based on his observations and that, at minimum, it would be "good to rule out marijuana." (*Id.* at 7:47:53).

Trooper Snelling obtained Gregory's identification and requested dispatch to run his information. (*Id.* at 7:49:50). While Trooper Snelling waited for the checks on Gregory, dispatch reported that Funk's EPIC check was negative. (*Id.* at

5

7:50:40).  About a minute and a half later, dispatch reported that Gregory had a

warrant out of Washington for escape from community custody related to

possession of controlled substances that was only extraditable to surrounding

states, and a warrant out of Gallatin County for a traffic infraction.  (Doc. 21 at

11).  He also had cautions for assault, possession of a controlled substance, and

possession with intent to distribute.  (*Id.*).

Trooper Snelling then ordered an EPIC check on Gregory.  (Doc. 23 at

7:53:50).  The check came back clear about six minutes later.  (*Id.* at 8:01:05).

Trooper Snelling exited her patrol car and Mirandized Funk.  He agreed to

speak with her and, according to Trooper Snelling, was still "extremely nervous

and was breathing hard and shaking."  (Doc. 21 at 11).  Trooper Snelling asked

him if he had marijuana in the car.  (*Id.*).  He stared at the ground in silence for a

couple minutes, breathing heavily and shaking his head.  (*Id.*).  At one point, he

said, "I can't believe this is happening," then admitted that he had a roach in the

vehicle and had forgotten that Montana is a "no tolerance state."  (*Id.*).  Trooper

Snelling stated that marijuana was legal, and she was not concerned about a roach.

(*Id.*).  Funk "was not relieved and still very nervous."  (*Id.*).  He denied having

cocaine, heroin, methamphetamine, or large amounts of cash.  (*Id.*).

Trooper Snelling and Officer Idhe repeatedly explained that they were not

concerned about small amounts of marijuana, but Funk's nervous demeanor did

not change. (*Id.*). Eventually, Trooper Snelling asked him if she could search the vehicle. Funk did not give clear or consistent answers to Trooper Snelling's search request. (*Id.* at 12). Trooper Snelling explained if he was unsure, she would take that as a no. (*Id.*). Funk never gave a firm yes, and after several minutes Trooper Snelling seized the vehicle to search it once a search warrant was obtained. (*Id.*).

Trooper Snelling handcuffed Funk, frisked him, and placed him in the back of her patrol car. (Doc. 23 at 8:16:01-8:16:30). The officers also removed Gregory from the truck then told the men to go wait at the nearby truck stop for them to apply for a roadside warrant and conduct a search. (*Id.* at 8:23:04-8:23:11). Officer Idhe noted in his report that, while removing Gregory from the truck, he saw a butane-type torch in the center console and another along the right side of the driver's seat. (Doc. 21 at 6).

Officer Idhe applied roadside for a search warrant with the Honorable Judge Collette Davies of the Thirteenth Judicial District Court, listing the facts he believed established probable cause that Funk and Gregory were possibly engaged in criminal activity, namely criminal possession of dangerous drugs in violation of Mont. Code Ann. § 45-9-102. (Doc. 22). Judge Davies initially did not approve the search warrant and requested a K9 sniff. (Doc. 21 at 6). She acknowledged that Officer Idhe's K9 was trained to detect marijuana (which Funk had already

admitted was in the truck), as well as cocaine, heroin, and methamphetamine, but requested the sniff anyway. (*Id.*).

Officer Idhe deployed his K9 at 9:22 a.m. The K9 alerted and indicated, and Officer Idhe updated the search warrant to reflect these findings. (*Id.*). Trooper Snelling secured the truck and had it towed to the Billings MHP facility. (*Id.*). Judge Davies granted the search warrant later that day. (*Id.*).

The next morning, Trooper Snelling and Officer Idhe executed the search warrant. They found methamphetamine, small amounts of marijuana, and various items of paraphernalia. 342 grams of the methamphetamine were turned over to the Drug Enforcement Administration. Funk was then charged in this Court with possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1).

## II.    Legal Standard

The Fourth Amendment prohibits unreasonable searches and seizures. A traffic stop is a "seizure" within the meaning of the Fourth Amendment. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). Like a *Terry* stop, law enforcement only needs reasonable suspicion that a crime has occurred to conduct an investigatory stop or seizure. *United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000). "Reasonable suspicion is defined as 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v.*

*Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013) (quoting *United States v. Cortez*, 499 U.S. 411, 417-18 (1981)).  Reasonable suspicion requires specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that a particular person is engaged in criminal conduct.  *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000).  "The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence and less than probable cause."  *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000).  The standard is "not a particularly high threshold to reach" but "a mere hunch is insufficient."  *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013).

In determining whether reasonable suspicion exists, the underlying facts are considered in their totality and in light of the officer's experience.  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  Further, "[t]he standard for determining whether probable cause or reasonable suspicion exists is an objective one; it does not turn either on the subjective thought processes of the officer ...."  *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016).  The facts justifying a search or a stop must be "known to officers" at the time of the search or stop.  *Id.* (citations omitted).

If a person is stopped for violating the traffic code, the stop may not be prolonged beyond the time reasonably required to complete the mission of the stop absent independent reasonable suspicion to detain the person further.  *Rodriguez v.*

*United States*, 575 U.S. 348, 354 (2015) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)) (hereinafter *Rodriguez I*). The mission of the stop consists of determining whether to issue a ticket for the infraction and inquiries ordinary to enforcing the traffic code. *Id.* at 355. Such inquiries include checking the driver's license, determining whether the driver has outstanding warrants, and inspecting the automobile's registration and proof of insurance. *Id.* Authority for the stop ends when tasks tied to the traffic infraction are, or reasonably should have been, completed. *Id.* at 354.

Officers are permitted to conduct unrelated inquiries or checks without reasonable suspicion so long as they do not prolong the stop. *Id.* at 355. Inquiries unrelated to traffic stops include ordering an EPIC check, demanding the passenger's identification, conducting a dog sniff, and asking questions about matters unrelated to the stop. *Gorman*, 859 F.3d at 711 (characterizing an EPIC check as "non-routine"); *United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019) (passenger's identification "will ordinarily have no relation to driver's safe operation of a vehicle"); *Rodriguez I*, 575 U.S. at 354-55 (drug dog sniff and questions on unrelated matters). If an officer goes beyond the scope of the traffic mission by conducting unrelated inquiries or checks, the Court asks not whether the unrelated inquiry "occurs before or after the officer issues a ticket" for the traffic infraction but whether conducting the unrelated inquiry "'prolongs'—*i.e.*,

adds time to—'the stop.'" *Id.* at 357.  Even a brief or de minimis extension of the stop is unconstitutional. *Id.* at 356.

If law enforcement violated Funk's Fourth Amendment right to be free from "unreasonable searches and seizures" during the traffic stop, "then all evidence seized as a result of the stop must be suppressed as the fruit of the poisonous tree." *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).

## III.   Analysis

Funk argues that, as early as 23 minutes into the stop, Trooper Snelling should have issued the traffic citations and concluded the stop because she had learned facts that dispelled reasonable suspicion of other criminal activity: Funk had no warrants and a clean EPIC record, and Gregory had no extraditable warrants. (Doc. 20 at 25).  The officers' claims of nervousness as a basis for reasonable suspicion are "highly subjective," since neither knew Funk or how he usually communicates and copes with stress. (*Id.* at 26).  Further, any suspicion based on their travel plans was so generalized that it risks "'sweep[ing] many citizens into a generality of suspicious appearance merely on a hunch.'" (*Id.* at 28 (citing *United States v. Rodriguez*, 976 F.2d 592, 595-96 (9th Cir. 1992) (hereinafter *Rodriguez II*)).  Without any other basis for reasonable suspicion, Trooper Snelling and Officer Idhe's "meandering interrogation regarding topics

11

unrelated to the mission of the traffic stop" were "an unconstitutional attempt to drum up reasonable suspicion." (*Id.* at 26).

The Government disagrees, arguing that the officers had "ample reasonable suspicion to prolong the traffic stop to resolve their suspicions." (Doc. 24 at 11). The Government notes that Funk and Gregory's trip "matched a cross-country drug" run, their stories were inconsistent in a way that indicated deception, and Funk was excessively nervous despite officers telling him they did not care about small amounts of marijuana. (*Id.* at 13-15). Based on these facts, the Government asserts the officers had reasonable suspicion to extend the stop and investigate unrelated matters.

As an initial matter, the Court finds the investigation of the traffic stop was concluded after Trooper Snelling received the results of Funk's criminal history check and the validation of his information. (Doc. 23 at 7:35:13); *Rodriguez I* at 355. All that remained to be done was the issuing of traffic citations or warnings. Any prolonging of the traffic stop thereafter must be supported by independent reasonable suspicion. *United States v. Evans,* 786 F.3d 779, 788 (9th Cir. 2015).

After the mission of the traffic stop had ended, Trooper Snelling and Officer Idhe undertook five unrelated inquiries that each prolonged the traffic stop: (1) the

EPIC check on Funk,[5] (2) the demand for Gregory's identification and asking

dispatch to run his information, (3) the EPIC check on Gregory, (4) the

investigative seizure of Funk's truck pending the search warrant/dog sniff, and (5)

the dog sniff.  Each required the officers to have established reasonable suspicion

when the inquiry was undertaken that Funk and Gregory were engaged in criminal

activity.

The parties do not systematically address whether reasonable suspicion

existed when the officers undertook each unrelated inquiry.  Rather, they tend to

blend the timeline of when the officers came to know certain facts.  Given the law

requires the officers to have reasonable suspicion when they conducted each

unrelated inquiry and extended the duration of the traffic stop, the Court will

address whether reasonable suspicion existed when the officers undertook each

inquiry.

As the Court will describe, Trooper Snelling did not have reasonable

suspicion that Funk was engaged in criminal activity when she ordered the EPIC

---

[5] Neither party addresses whether Trooper Snelling had reasonable suspicion when she ordered
the EPIC check on Funk and extend the traffic stop another 12 minutes while waiting for the
results.  However, this circuit considers an EPIC check an unrelated inquiry that requires
reasonable suspicion. *See Gorman*, 859 F.3d at 711.  Additionally, in the 12 minutes it took for
dispatch to return Funk's EPIC results, Officer Idhe questioned Funk and Gregory and obtained
key facts and observations that the Government alleges formed the basis for the officers'
reasonable suspicion.  As such, it is necessary to analyze whether Trooper Snelling had
reasonable suspicion to conduct the EPIC check.

check on Funk. Accordingly, the information she and Officer Idhe gathered while waiting for the EPIC check results was unconstitutionally obtained. Information unconstitutionally obtained cannot be used to support a finding of reasonable suspicion to continue prolonging the traffic stop and ultimately seizing Funk's truck and applying for the search warrant. The information obtained and the evidence seized from Funk's truck are therefore fruit of the poisonous tree and must be suppressed. *Morales*, 252 F.3d 1070.

A.    *EPIC Check on Funk*

Trooper Snelling called dispatch to order the EPIC check on Funk approximately eight minutes into the stop. (Doc. 23 at 7:38:32). At that time, the evidence shows that the officers knew: (1) Funk pulled over before Trooper Snelling activated her lights, (2) Funk was acting nervous, (3) according to Funk, he and his passenger were traveling from Spokane to Sheridan to help a friend move, and (4) they were traveling from a source state to a destination state.

The Court finds that these facts do not constitute reasonable suspicion. First, the fact that Funk pulled onto the shoulder of the exit ramp before Trooper Snelling activated her lights is not a basis for suspicion because courts have found acts that are objectively more suspicious to be irrelevant to a reasonable suspicion calculation. For instance, in *United States v. Pinex*, this Court found that a defendant who put his hands in the air when an officer asked him a question

outside of his vehicle during a traffic stop was "potentially odd behavior" but did

not "support[] a suspicion of criminal activity." 129 F. Supp. 3d 982, 985 n.3 (D.

Mont. 2015). Generally, people interacting with law enforcement only raise their

hands in the air as a sign of innocence and/or to signal to police that they are not

holding anything dangerous. In contrast, people frequently pull over for law

enforcement vehicles, though less often prior to the officer activating their patrol

car lights. Thus, though Funk's behavior was potentially odd, it does not support a

suspicion of criminal activity.

Second, nervousness alone does not establish reasonable suspicion or justify

a prolonged detention. *United States v. Chavez-Valenzuela*, 268 F.3d 719, 726 (9th

Cir. 2001) *amended*, 279 F.3d 1062 (9th Cir. 2002), *overruled on other grounds by*

*Muehler v. Mena*, 544 U.S. 93 (2005). The Government shows that Funk's

nervousness was more than normally expected during a police encounter.

However, the Government does not show his nervousness was different than his

usual demeanor. Trooper Snelling testified she had never met Funk before and did

not know about his education, mental health, or past experiences with law

enforcement that may explain Funk's nervousness. *See United States v. Salzano*,

158 F.3d 1107, 1113 (10th Cir. 1998) (discounting evidence that the defendant's

hands were shaking more than the trooper usually sees during traffic stops because

the trooper did not know the defendant and thus "had no basis upon which to

contrast Mr. Salzano's behavior during the traffic stop with his usual demeanor."). Accordingly, Funk's nervousness is only relevant if "other particularized, objective factors" existed to support a reasonable suspicion or justify a prolonged detention. *Chavez-Valenzuela*, 268 F.3d at 726.

The final two facts—that Funk and his passenger supposedly were traveling from Washington (a source state) to Wyoming (a destination state) to help a friend move—are not sufficiently particular to establish reasonable suspicion on their own or in combination with Funk's nervousness. Such facts "describe too many individuals to create a reasonable suspicion that [Funk] was engaged in criminal activity." *Rodriguez II*, 976 F.2d at 596. "Innocents, as well as criminals" drive from Washington to Wyoming to help a friend.[6] (*Id*.). In fact, when Officer Idhe said to Trooper Snelling before she ordered the EPIC check that Funk's story was "inconsistent," she interrupted to say, "Well, it is odd." (Doc. 23 at 7:38:20). (Officer Ihde had not yet interviewed Gregory, so there was nothing for Funk's statement to be inconsistent with.) As stated, "odd" is not suspicious. Rather, the officers' characterization of Funk's story was only a "subjective nefarious inference[] drawn from perfectly innocuous and legal behavior and circumstances

---

[6] During the hearing, Officer Idhe frequently described this drive as across the country. Driving from eastern Washington to northern Wyoming is not driving across the country. Trooper Snelling testified it takes approximately eight hours to drive from Spokane, WA to Sheridan, WY.

…." *Montana v. Noli*, 529 P.3d 813, 840 (Mont. 2023) (applying *Rodriguez I*, 575 U.S. 348).

Without any other facts specific to the encounter with Funk to suspect he was engaged in criminal activity, Trooper Snelling acted on a hunch, not reasonable suspicion, in ordering the EPIC check on Funk and prolonging the stop 15 minutes past when the mission of the traffic stop was over until dispatch returned the results. (Doc. 23 at 7:50:40). This constitutes an unconstitutional extension of the traffic stop. *Rodriguez I* at 356. Thus, information the officers obtained from Funk and Gregory while they waited for the results of Funk's EPIC check was unconstitutionally obtained and could not be used to support a finding of reasonable suspicion to continue prolonging the traffic stop and ultimately seize Funk's truck and apply for a search warrant. The evidence discovered in the subsequent search of Funk's truck must be suppressed as fruit of the poisonous tree. *Morales*, 252 F.3d at 1073.

B.   *Inquiries Into Gregory*

While waiting for Funk's EPIC results, Trooper Snelling undertook two other unrelated inquiries that further extended the traffic stop—demanding Gregory's identification at 7:48 a.m. and ordering an EPIC check on him at 7:54 a.m. For the following reasons, Trooper Snelling still had not developed reasonable suspicion when she demanded Gregory's identification. However, she

17

had developed reasonable suspicion when she ran the EPIC check on him because of Gregory's drug-related warrants and warnings.

Trooper Snelling demanded Gregory's identification about 13 minutes after the mission of the traffic stop was over. (Doc. 23 at 7:48:15). At that time, Officer Idhe had talked separately with Funk and Gregory and obtained each man's account of their trip. From those conversations, Officer Idhe had deduced the following facts, in addition to those existing when Trooper Snelling ordered the EPIC check: (1) Funk and Gregory made inconsistent remarks about the luggage they each had; (2) Funk and Gregory were taking a short trip from a source to a destination state; (3) Gregory's story about their trip was vague; (4) despite knowing each other for a couple years, Gregory and Funk did not know each other's last names; and (5) both men were nervous.

Whether these facts support reasonable suspicion is fuzzier than whether those that existed when Trooper Snelling ordered the EPIC check on Funk did. On the one hand, law enforcement had gathered facts specific and unique to Funk and Gregory's trip that signaled they may be engaged in criminal activity or employing evasive tactics. On the other hand, minor discrepancies are not necessarily sufficient for reasonable suspicion. *See United States v. Simpson,* 609 F.3d 1140, 1150 (10th Cir. 2010) (finding that "fairly minor evasions and inconsistencies" normally do not constitute reasonable suspicion); *United States v. Estrada,* 459

F.3d 627, 631 (5th Cir. 2006) ("Mere 'uneasy feelings' and inconsistent stories between a driver and passenger do not constitute articulable facts that support a reasonable suspicion of drug trafficking.").

Notably, Funk and Gregory's stories about their origin, destination, purpose, and duration of stay were consistent and plausible. In contrast, the Court in *Pinex* found that law enforcement had reasonable suspicion because Pinex's explanation that they were driving from Washington to North Dakota to see his stepfather in the hospital then driving back the next day was implausible. 129 F. Supp. 3d at 991-92. Additionally, Pinex and his passenger, who claimed to be stepbrothers, had different accounts of why their stepfather/father was in the hospital and of where they napped on the way to North Dakota. *Id.* at 992. The passenger also could not remember Pinex's last name, despite being family. *Id.*

The facts that existed here are more like those in *Salzano*, which the Tenth Circuit found did not amount to particularized reasonable suspicion on their own or in the aggregate. 158 F.3d 1107. There, the facts relied upon by the government were: "(1) Mr. Salzano's uneconomical decision to travel across the country in an expensive motor home at a rental cost of $3,900 and a fuel cost of approximately $1,000; (2) the discrepancy between the number of persons stated on the rental agreement and the fact that Mr. Salzano was traveling alone; (3) the size of the motor home and the knowledge that such motor homes are often used to haul large

19

quantities of drugs; (4) Mr. Salzano's visible nervousness while handing Trooper
Guerrero the rental papers; (5) the smell of evergreen in the vehicle; and (6) Mr.
Salzano's statement that he had come from California." *Id.* at 1111.[7]  Likewise,
here, Funk and Gregory's stories were odd and had minor inconsistencies, they
were nervous, and they came from a source state.  Given these similarities—and
the fact that neither Trooper Snelling nor Officer Idhe reported suspicious smells—
the Court finds that Trooper Snelling did not have reasonable suspicion when she
demanded Gregory's identification.

However, the revelations about Gregory's drug-related warrant and warnings
officers learned from dispatch at 7:52 a.m. tipped the scale from a hunch to
reasonable suspicion because the officers now had particular facts connecting
Gregory with drug possession and trafficking.  Combined with the details about
their trip, these facts gave the officers reasonable suspicion to believe that the men
were engaged in criminal activity (specifically drug possession or trafficking), to
run the EPIC check on Gregory, and to extend the stop.  *United States v.
Cotterman,* 709 F.3d 952, 968 (9th Cir. 2013) (en banc) (citing *Burrell v. McIlroy,*
464 F.3d 853, 858 n.3 (9th Cir. 2006) ("'Although a prior criminal history cannot
alone establish reasonable suspicion ... to support a detention or an arrest, it is

---

[7] *Salzano* notes that drug smugglers often use the scent of natural evergreen to mask drugs. *Id.* at
1114.

permissible to consider such a fact as part of the total calculus of information in

th[at] determination[].'")).  Importantly, though, such reasonable suspicion did not

arise until 17 minutes after the mission of the traffic stop ended, thus rendering

their actions after dispatch reported Funk had no warrants or priors

unconstitutional.

    C.    *Seizure of the Truck Pending the Warrant/Dog Sniff and the Dog Sniff*

Since Gregory's EPIC check came back negative—which would serve to

dispel the officers' suspicion—the Court next assesses whether Trooper Snelling

still had reasonable suspicion when she seized Funk's vehicle pending the search

warrant and, later the dog sniff.  As an initial matter, the Court will address the

applicable legal standard, which the parties assert is probable cause.

The cases cited by the parties to support a probable cause standard involve

abandoned vehicles that law enforcement impounded or otherwise transported

away from where they were parked in order to be searched at a later time or

pending a search warrant.  *United States v. Bagley*, 772 F.2d 482, 486, 491 (9th

Cir. 1985) (determining whether law enforcement had probable cause to seize a

vehicle abandoned by the defendant and taken to the police storage lot); *Metal

Jeans, Inc. v. California*, 737 Fed. Appx. 826, 828 (9th Cir. 2018) (applying

probable cause standard where the police towed a tractor-trailer suspected of being

stolen only after it had been left unattended on the side of the freeway for more

than 24 hours). The other case cited by Funk, *United States v. Faagai*, 869 F.3d

1145, 1148, 1150 (9th Cir. 2017), involved a seizure of a vehicle only to the extent

that the defendant was denied access to it while officers conducted a warrantless

search. The *Faagai* court did not discuss the legality of any seizure and instead

focused on the legality of the warrantless search. *Id.*

This Court has applied the reasonable suspicion standard to seizure of a non-

abandoned vehicle during a traffic stop that law enforcement does not move but

instead secures and asks the vehicle occupants to leave pending a search warrant

application. *United States v. Petersen*, CR 22-91-BLG-SPW, 2023 WL 3818412,

at *3 (D. Mont. June 5, 2023). Another court in this district also applied

reasonable suspicion when a vehicle was detained with the passenger inside

pending a further investigative inquiry, namely a dog sniff. *United States v.*

*Browne*, 219 F. Supp. 3d 1030, 1038 (D. Mont. 2016). Given the factual

differences between this case and those cited by the parties, and the precedent in

this district on cases with similar facts, the Court will apply the reasonable

suspicion standard to determine if the seizure of Funk's truck and the subsequent

dog sniff at this point was lawful.

Moving to whether the officers had established reasonable suspicion when

they seized the truck and conducted the dog sniff, the Court finds that the officers

did. Gregory's negative EPIC check did not erase the suspicion about drug

trafficking generated from Gregory's criminal history check. Additionally, while officers questioned Funk on the hood of Trooper Snelling's patrol car, Funk continued to act nervous and distressed despite being told repeatedly that the officers did not care if he had small amounts of marijuana in the car. (Doc. 21 at 11-12). Together, Gregory's warrants and warnings connecting him with drug possession and trafficking, Funk's unabating nervousness, the nature of their trip, inconsistencies between their stories, and lack of knowledge of each other's last names provided officers with suspicions of drug trafficking that were both objective and particularized. Such reasonable suspicion justified their seizure of Funk's truck and the dog sniff.

The finding of reasonable suspicion at this stage does not affect the Court's holding but rather serves to articulate when an objective officer would have established reasonable suspicion to conduct unrelated inquiries and extend the stop, and when they did not. The officers here unconstitutionally extended the stop because they had not established reasonable suspicion when Trooper Snelling ordered the EPIC check on Funk. Rather, it took officers an additional 17 minutes from the end of the mission of the stop to develop reasonable suspicion. (7:35:13 to 7:52:10). As a result, Funk effectively was detained unconstitutionally for nearly 50 minutes while the officers investigated him and Gregory for drug possession/trafficking (7:35:13 to 8:23:11), then had his vehicle seized for an

23

additional hour before Officer Idhe conducted the dog sniff.  Thus, all evidence

obtained after Trooper Snelling ordered the EPIC check must be suppressed as

fruit of the poisonous tree.  *Morales*, 252 F.3d 1070.

## IV.    Conclusion

For these reasons, the Court finds Trooper Snelling violated Funk's Fourth

Amendment rights by extending the traffic stop after completing its mission

without reasonable suspicion.  Accordingly, the evidence seized from the search of

Funk's truck must be suppressed.  IT IS HEREBY ORDERED that Defendant

Brian George Funk's Motion to Suppress (Doc. 19) is GRANTED.


DATED this __29th__ day of June, 2023.

SUSAN P. WATTERS
United States District Judge